## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 22 2020, 11:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Aubrey J. Crist
Boston Bever Klinge Cross & Chidester
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of N.J. (Minor Child), | July 22, 2020 |
| | Court of Appeals Case No. 20A-JT-25 |
| H.J. (Mother), | |
| *Appellant-Respondent,* | Appeal from the Wayne Superior Court |
| v. | The Honorable Darrin M. Dolehanty, Judge |
| | The Honorable Kaarin M. Lueck, Juvenile Magistrate |
| Indiana Department of Child Services, | Trial Court Cause No. 89D03-1909-JT-93 |
| *Appellee-Petitioner.* | |

**Brown, Judge.**

[1] H.J. ("Mother") appeals the involuntary termination of her parental rights to her child, N.J. We affirm.

## Facts and Procedural History

[2] N.J. was born on March 22, 2017, to Mother and S.J. ("Father").[1] The Indiana Department of Child Services ("DCS") received allegations that Mother did not obtain prenatal care until the month prior to N.J.'s birth, there were concerns of developmental delays with Mother and Father, and Mother and Father had an older child who was in the protective custody of the State of Missouri. On March 24, 2017, DCS removed N.J. from Mother on an emergency basis, and on March 28, 2017, DCS filed a petition alleging N.J. was a child in need of services ("CHINS").

[3] On April 23, 2017, Mother and Father were in an automobile accident and hospitalized. Father suffered a traumatic brain injury. On May 18, 2017, DCS filed an amended CHINS Petition. On June 20, 2017, the trial court entered an order stating Mother's counsel indicated that Mother continued to be hospitalized and found that N.J. was a CHINS.

[4] On January 4, 2018, the court entered a dispositional order requiring Mother to maintain stable housing, secure and keep a legal and stable source of income, complete a parenting assessment and successfully complete all recommendations, submit to random drug screens, meet all personal medical

---

[1] Father does not appeal the termination of his parental rights to N.J.

and mental health needs in a timely and complete manner, attend all scheduled visitations with the child, and complete psychological evaluations and any recommendations. On September 13, 2019, DCS filed a verified petition for involuntary termination of the parent-child relationship of Mother and Father with N.J.

[5] On November 13, 2019, the court held a fact-finding hearing. At the hearing, Mother's counsel objected to DCS calling Mother as a witness stating that she was asserting her Fifth Amendment right against incrimination. The court stated: "DCS is allowed to ask foundational questions such as who is she? And then I get your fifth amendment objection would then perhaps kick in after we get off of the foundational questions, but they're allowed to ask the foundational questions outside the fifth amendment privilege." Transcript Volume II at 23. The court also stated: "And so, [DCS Attorney], I, what my plan would be for you is to go ahead and begin asking questions. [Mother's counsel] will object when he believes you've strayed off of the foundation into fifth amendment and then that blanket objection will then start kicking in." *Id.*

[6] When asked by DCS's counsel where she lived, Mother answered: "Here and there and everywhere until I can get back to Illinois or whatever." *Id.* at 24. When asked for the name of the friend with whom she had stayed the previous night, Mother's counsel objected and stated that "[t]his question is straying from the foundation information . . . and is potentially incriminating." *Id.* at 25. DCS's counsel stated she did not believe it was incriminating. Upon questioning by the court, Mother testified that she had stayed in Richmond

with a friend the previous night. After further testimony, the court stated: "[Mother], I'm going to stop you for a second. [Mother's counsel], I just want to make sure that we're on the same page. When you, I need you to make an objection when you need to that we're stopping again. Okay?" *Id.* at 28. Mother's counsel indicated that he understood. Mother testified that she and Father were involved in a car accident on April 23, 2017, she was hospitalized, and she went to six facilities. When DCS's counsel asked Mother if she left any of the six facilities when the doctors said she should not, Mother answered: "Only once." *Id.* at 30. Mother's counsel objected on the basis of "[p]rivilege, that privilege being self-incrimination, Judge and relevance." *Id.* The court sustained the objection. Mother's counsel moved to strike Mother's answer, and the court replied: "Okay." *Id.*

[7] Lesley Hamilton-Williams, a DCS assessment worker, testified that she interviewed Mother and Father because of the allegations, had concerns with Mother having developmental delays, and visited the location where Mother indicated they were going to stay and found an empty trailer. She also testified that DCS's decision to remove N.J. was based on concerns with developmental delays, instability with mental health, untreated mental health, and a concern that the parents might leave the state with N.J.

[8] DCS also presented the testimony of Family Case Manager Lori Sumwalt, who worked with Mother shortly after N.J. was detained on March 24, 2017, Justin Daniels, a Homemaker Parent Aid, who provided homemaker services to Mother and supervised visits for her and N.J. from March 28, 2017, until April

of 2018, Robin Cruz, a therapist who facilitated therapeutic visits between Mother and N.J. from September of 2017 until March of 2018, Amy Bray, a family support specialist at Centerstone who helped administer services providing parenting education and life learning skills to Mother from October 2017 to August or September of 2018. Family Case Manager Emily Kilgore ("FCM Kilgore"), who was the family case manager for N.J. and her family from February 2018 until March 2019, Kristine Nunn, a therapist at Centerstone, Connie Hawley, a clinical supervisor for Meridian Health Services who worked with Mother beginning in March of 2019, Family Case Manager Michelle Montgomery, who was a family case manager in this case at the time of the fact-finding hearing, and Karen Bowen, the Court Appointed Special Advocates Director, also testified for DCS.

On December 5, 2019, the court entered an order terminating Mother's parental rights as to N.J. The court concluded there was a reasonable probability that the conditions resulting in the child's removal would not be remedied, there was a reasonable probability that continuation of the parent-child relationship posed a threat to the well-being of the child, termination of the parent-child relationship was in the child's best interests, and there was a satisfactory plan for care and treatment of the child.

## *Discussion*

We first address Mother's argument that "the process due in a termination of parental rights case is such that the Fifth Amendment protection against self-incrimination should operate to bar parents from being called as a witness

against themselves in the termination of parental rights context." Appellant's Brief at 17. "[I]n CHINS and TPR proceedings, a court may not compel a parent's admission to a crime – if the admission could be used against him or her in a subsequent criminal proceeding – under the threat of losing parental rights." *Matter of Ma.H.*, 134 N.E.3d 41, 46-47 (Ind. 2019), *cert. denied*. "Yet, in civil proceedings, a court can draw a negative inference from a claim of the Fifth Amendment privilege against self-incrimination." *Id.* at 47. Generally, "claims of privilege must be made and sustained on a question-by-question or document-by-document basis." *In re Kefalidis*, 714 N.E.2d 243, 248 (Ind. Ct. App. 1999) (citing *Hayworth v. Schilli Leasing, Inc.*, 669 N.E.2d 165, 169 (Ind. 1996)). In both instances where Mother objected and referred to the Fifth Amendment, the court did not compel her to answer the questions. We cannot say Mother was denied her rights under the Fifth Amendment.

[11] We next turn to Mother's argument that the evidence is insufficient to support the termination of her parental rights with respect to N.J. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> > (C) that termination is in the best interests of the child; and
>
> > (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[12] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.*

[13] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id.* "Our review must 'give "due regard" to the trial

court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640. The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

[14] Mother argues the trial court erred in concluding that a reasonable probability exists that the conditions resulting in the child's removal and the circumstances surrounding placement outside the home of the parents will not be remedied and that termination of parental rights is in the best interests of the child. She asserts that the limited nature of the findings regarding her mental health issues fails to support the court's judgment by clear and convincing evidence.

[15] In determining whether the conditions that resulted in N.J.'s removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial

probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *Id.*

[16] The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, drug abuse, history of neglect, failure to provide support, lack of adequate housing, and the services offered by DCS and the parent's response to those services. *See id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[17] To the extent Mother does not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[18] With respect to the trial court's conclusion that there was a reasonable probability that the conditions resulting in the child's removal will not be

remedied, Mother's sole argument is that Finding 33, which spans three pages in the court's order, provides a limited description of her mental health issues and fails to support the judgment. In Finding 33, the court found Mother completed diagnostic testing on November 8, 2017, with Dr. Daniel Westmoreland, who stated she "could not parent the child autonomously at that time, Mother's lack of insight and judgment may endanger the child; and one day, after the child is able to communicate more and with support and training, Mother may be able to parent the child." Appellant's Appendix Volume II at 94. The court also found that "Mother completed the psychological evaluation through Connections, with diagnoses of Major Depressive Disorder, Post-Traumatic Stress Disorder, Attention Deficit Hyperactivity Disorder, and Borderline Intellectual Functioning." *Id.* It found Mother participated in life skills training through Centerstone between October 2017 and August 2018, but she did not accomplish the life skills goals including learning to budget, finding safe housing, and caring for her own needs. The court found that, while Mother attended some parenting class programs, she did not receive a certificate for attendance for two of the programs due to excessive absences and did not remember parenting skills from week to week. In Finding 33, the court also found that, since March 27, 2019, Mother attended one parenting time session on October 23, 2019, which she requested to terminate early. It found that Mother began weekly individual therapy services with Kristine Nunn from Centerstone on April 12, 2018, she failed to appear for or canceled five of sixteen scheduled sessions, she "did not meet any of the individual therapy treatment goals," and she stopped attending individual

therapy sessions after August 23, 2018. *Id.* at 96. It found Mother completed an intake at Meridian Health Services to reengage in individual therapy in February 2019, but she "declined to continue therapy, because she planned to move back to Missouri." *Id.* The court also found in Finding 33 that Mother did not participate in drug screens through Redwood Toxicology Laboratory, declined to provide a drug screen sample in October 2019, and stated that if she provided a sample it would contain THC.

[19] Further, Mother does not challenge a number of the court's other findings. The court found that "[a]s an adult, Mother has a lengthy history of mental illness, periods of placement in mental health facilities, and taking mental health medications sporadically." *Id.* at 92. The court found that Mother was admitted into at least six different hospitals and rehabilitation facilities for treatment between April 23, 2019, and June 29, 2019, including Methodist Hospital in a locked psychiatric ward and Reid Hospital for a psychiatric admission. The court also found that, "[s]ince Mother was approximately twenty (20) years old, Mother has received Social Security benefits, but Mother does not know the reason for the income." *Id.* at 97.

[20] The court detailed Mother's living situation including sleeping in a vehicle in a Walmart parking lot and living in the woods behind a K-Mart, in a hotel, with the child's paternal grandmother, in her own apartment, again with the child's paternal grandmother, and with a man with whom there had been incidents of domestic violence. The court also found Mother was ordered to surrender premises in Richmond to the landlord on April 23, 2019, moved to Missouri in

August 2019, moved back to Richmond in October 2019, and "[m]ost recently . . . has been staying with friends in Richmond, Indiana, and the child's paternal grandmother and step-grandfather in Carbondale, Illinois." *Id.*

[21] Mother also does not challenge the court's findings regarding her lack of involvement in services. The court found that between April 2018 and March 27, 2019, Mother attended thirty-three of eighty-four scheduled parenting time sessions and that FCM Kilgore ended one session early after Mother was not watching the child and the child almost fell off a slide. The court found Mother attended one parenting time session since March 27, 2019, and that she requested it be terminated early. Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability the conditions leading to N.J.'s removal will not be remedied.

[22] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* A child has a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that a child cannot wait indefinitely for the child's parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently

impaired before terminating the parent-child relationship. *See In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648. Recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*. Court Appointed Special Advocates Director Bowen testified that termination of Mother's parental rights is in N.J.'s best interest. Based on the testimony, as well as the totality of the evidence as set forth in the record and the court's termination order, we conclude the court's determination that termination is in the best interest of N.J. is supported by clear and convincing evidence.

[23] To the extent Mother argues that DCS does not have a satisfactory plan for the care and treatment of N.J., we note that adoption is a "satisfactory plan" for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. FCM Kilgore testified that DCS's plan for N.J.'s future care and treatment is adoption and that she was placed in a pre-adoptive home. The record reveals support for the court's determination that adoption is a

satisfactory plan for the care and treatment of N.J. *See A.J. v. Marion Cty. Office of Family & Children*, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008) (concluding that, in light of the evidence, the plan for adoption was not unsatisfactory), *trans. denied*.

[24] We conclude that clear and convincing evidence supports the trial court's judgment terminating the parental rights of Mother with respect to N.J. and affirm the trial court.

[25] Affirmed.

Najam, J., and Kirsch, J., concur.